Good morning, Judge Hamilton. Good morning, Judge Hamilton. Good morning. Nice to see you. We are ready for argument in our first case, Monsanto v. ARE-108. Mr. McKean, and you have been instructed to please pause when Judge Hamilton raises his hand. Thank you. If it pleases the Court, my name is Mark McKean of the Paul Hastings Firm on behalf of ARE-108 Alexander Road, LLC. For going forward, this argument I'll refer to as ARE. The first issue before the Court today relates to the summary judgment that was granted by the District Court without ARE being able to obtain any discovery prior to that ruling. And one of the key issues at play, of course, is whether the contractual language at issue in the 1B lease, whether there existed a latent ambiguity, some level of unclarity such that the meaning was less than certain when looked at all the surrounding circumstances in the matter. And the circumstances in this case are not linear, nor are they in a vacuum. Back in 2007, the parties, Monsanto and ARE, regarding this high-tech space in North Carolina, concluded the negotiations ultimately of a third premise, and that was known as the 1C premise. And between that, Monsanto and ARE had leased up three different premises and at an amount of approximately 120,000 square feet. At the time that the 1C lease was being negotiated in 2007, there was existing leases 1B and 1A. And the parties, as part of their negotiations, wanted to make the terms concurrent. So they entered into amendments relating to the 1A and 1B lease. And regarding those amendments, it's undisputed that the parties negotiated simultaneously regarding some of these amendments. And ultimately, there was a language reached in the 1B second amendment, which, when you look at it, is on its face not very clear as to what the parties meant. Well, exactly. What is the ambiguity? The ambiguity is that it is, in my experience, I've never seen a contractual provision that ties a market rate base rent in the future to a number which the parties intended to be zero. And so when you have 103 percent to analyze a base rent as a market rate going forward starting in 2010, and you tie it to a base rent payable as of the date immediately preceding the commencement of such additional extension term, increased by 103 percent, multiplied by such base rent. Mr. McKean, more specifically, what is unclear about during any term extension no base rent and no improvement rent shall be payable? That is in the prior lease document back in 2000. That is clear as to what the parties intended at that time in 2000. But with respect to what was intended at the time the second amendment was entered into in 2007, there were concurrent things going on. Well, then perhaps you could identify, and I think this may be what Judge Floyd's question was going to, or at any rate, it's mine. What in 1A in the 2007 agreement was unclear? What was unclear was when they set forth a future rent if the additional extension is exercised. It was tied to a base rent amount as of the date immediately preceding the commencement of that additional extension increased by 103 percent. So if that amount is zero, why would the parties have included language that says it has to be 103 percent, at least 103 percent of zero? That does not make sense. That is not clear. When you look at the surrounding circumstances, which we were not permitted to show the court regarding all the back and forth on these negotiations, there is. It would be zero before the first additional extension. I'm sorry, Your Honor? It would be zero before the first additional extension. Yes, that is Monsanto's position that it would have been zero. But if it was zero, and that's what the parties intended, and it was, why would there be a specification of 103 percent of zero? And when you look at that in conjunction with the- It subsequently wouldn't necessarily be zero after the first term extension. Right. Starting in 2020, it wouldn't be zero. It would be this market rent, which was based upon, among other things, the previous base rent, as it said, as the date immediately preceding the rent that was in 2020. So it does not make sense. It is not absolutely clear. It is actually ambiguous as to what the parties were intending to do. And these things were going on at the same time the parties were negotiating a First Amendment on the 1A lease. So there's lots of things going on. There's lots of communications going on. There's lots of discussion about what the parties are intending. But we're not- you would agree if this contract is not ambiguous, we can't consider any extrinsic evidence. I agree that if the contract is unambiguous, that parole evidence should not be reviewed. So what's going on in negotiations and all that really doesn't matter. It's what the written words say. It is what the written words say, but I would argue that the written words are not absolutely clear because you have tying a numerical 103 percent amount to a number that's zero. Not necessarily. The number in subsequent extensions, it wouldn't be zero. It does actually make sense in context. But the ambiguity, there doesn't- and I think this is what Judge Floyd is- Floyd's question is going to as well. There doesn't appear to be ambiguity about the exercise of the five-year extension options. I agree. Per se. Per se, correct. Monsanto has the right to exercise the options. The issue is, in 2007 when this amendment was negotiated along with other amendments, the parties were discussing how to make the leases concurrent, the rent issues going forward under all the leases, and they were discussing essentially the timing and how it would apply. One thing they dealt with, which is part of the parole record, is what rent would be. One question for the court, of course, is whether the intent of the party was truly reflected in this documentation. And I would submit, and I've submitted some of the parole evidence, because right from the bat we knew that we wanted discovery to show the party's intent in this matter back in 2007, and Monsanto refused to provide any discovery on this matter. We showed, for example, that there were discussions in July of 2007 that- The fact that we're having some difficulty getting to an ambiguity that gets you beyond the language of the contract. I understand, Your Honor. And, again, the primary ambiguity is in 1A, the fact that it discusses about tying a future rent beginning in 2020 to an amount as of the date immediately preceding the commencement of that rent. Well, here's what bothers me. You've got two sophisticated parties, and you're essentially trying to argue that implicitly a right worth millions of dollars is eliminated, as opposed to having explicit terms. That's my real hang-up with your position. I understand, Your Honor. And all I'm asking in this procedural context is that my client be permitted the right to seek discovery so any ambiguity can be clarified. Obviously, it wasn't from my client's side. They thought this had been resolved pursuant to discussions. I appreciate the documentation is not as clear as one would like, because they sent out a notice setting forth the rent during the period after 2010 regarding the first extension. So my client believed that there was rent owed consistent with the rent that was owed during the same periods in the other leases. So my client went forward in – What language – oh, I'm sorry. Judge Hamilton. Judge Hamilton. Let me ask you several questions. It seems to me that you're contending that the written word, the contract words, created some ambiguity. I don't find that. If you look at Section 41 of the Phase 1B lease, it provides that during those two extensions, 2010-2015, 2015-2020, no base rent shall be payable. That's at the Joint Appendix at 256. Now, what's ambiguous about that? It seems to me that you're taking these contractual terms that were written out, and you're trying to create some ambiguity within that, and I don't see that. I understand, Your Honor. I don't see there's anything – I don't see there's anything ambiguous about the written word. And that's what you're getting at, that some ambiguity. The parties were negotiating. Well, they may have been negotiating, but they didn't change anything that I just referred to in that Phase 1B lease, Section 41. Your Honor, I understand the lease you're referring to, obviously, in 2000. And what I'm bringing – attempting to bring to the Court's attention is in 2007, the circumstances were different. The parties had additional leases. They were bringing things together concurrently regarding years. And at that time, there were discussions between the parties relating to terms, including future rent, of which – Well, they may have been talking about these things, but they didn't change anything. That's what you're trying to say there's ambiguity because the parties were negotiating. Well, if they didn't negotiate any changes in the written lease, I don't see where you're coming from. Yeah, Your Honor – What language in the Second Amendment do you rely on to support your argument that Monsanto must pay base rent during the 2010 and 2015 and 2015 and 2020 term extensions? Now, what language are you relying on? Your Honor, I'm relying on the language that is factually confusing, and that is the language – What's confusing about it? That the parties would tie a future base rent starting in 2020 to a multiplication of 103 percent when – if they intended that that number would be times zero. You wouldn't choose that number. You wouldn't have zero rent times 103 percent. And that is what is unclear about this, and I believe that parole evidence would clarify the issues and also allow my client to have equitable remedies, including reformation of the contract, which is one of the things that was pled regarding in the answer relating to future affirmative defenses based on discovery. So I just have never seen a lease document of which market rent is identified as to be based on the rent the day before the extension. And that's what it says. As of the date immediately preceding the commencement of such additional extension term, increased by 103 percent multiplied by such base rent. What period of time are you referring to for that 103 percent? Isn't that beyond the – that's the – what period of time? What extension are you referring to? That is the additional extension. That is from 2020 on. And I'm saying from through, for example, 2019, the number, I believe, the parties did not intend to be zero, or you wouldn't have had language that had a 103 percent of zero as a potential calculation. That doesn't make sense, and all I'm asking is before summary judgment is granted, that my client be permitted what it always asked for right from the start, diligently from the first moment, to receive discovery so this issue can be clarified. It makes perfect sense if you're contemplating additional extensions. That's the response. It makes perfect sense for any other, any subsequent extensions. What, the rent number? The first two, the number for the first two extensions could be zero, but after that, the extensions wouldn't be based on zero. Right, but by this – And why would we not read it in a way that comports with language that is very clear, providing for the existing five-year extensions not to be disturbed? In other words, to be granted on the terms that were reflected in the original lease. Why not read them in a way that makes perfect sense that is compatible with the original language? Why strain for an interpretation that creates an ambiguity in the face of clarity in those first two sentences? Your Honor, on the final point, I believe that language, when you're talking about calculating 103% of a number that's zero, doesn't make sense, doesn't reflect the party's intent that time, and all I was seeking is the ability to have directed minimal discovery that I asked for from the start in order to show what the party's true intent was in this matter, in conjunction with all the other negotiations that were going on. Thank you. Let me ask you one other question. Isn't there an arbitration provision if the parties can't agree on the base rent in 2020, couldn't they go to the arbitration provision? Yes, they could, Your Honor, with my understanding that the arbitrator would be looking at potentially at least 103% of the then existing base rent, and that number should not be zero or does not make sense. Thank you, Your Honor. Thank you, Mr. McKean. You have some time for rebuttal. Mr. Watkins. Thank you, Your Honor. Good morning. May it please the Court, I'm John Watkins on behalf of the Appellee and Cross-Appellant Monsanto Company. The contract interpretation issue presented by the lead appeal is a straightforward one. The contracts are fully integrated. There is no contract formation defect. ARE 108 has not, for example, pleaded duress, unconscionability, mistake, fraud, or any other defect. The operative language here is clear, plain, and unambiguous. For that reason, the Magistrate Judge and the District Court were right to construe the contracts as a matter of law without any resort to any extrinsic evidence. And because that plain contract language provides that Monsanto is entitled to two base rent-free term extensions, the Magistrate Judge was right to recommend granting, and the District Court was right to grant Monsanto's motion for summary judgment. Now, I believe the parties – yes, Your Honor. Let me ask you this, since it seems to be somewhat unclear. What base rent will be paid by Monsanto in 2020? Your Honor, under the Phase 1B lease, base rent will be paid in 2020 at the market rate. That is a defined term in the Second Amendment to the Phase 1B lease, and it defines it to be the market rate. And the procedure is as follows. ARE 108 determines market rate, and then Monsanto has the opportunity to agree or disagree with that market rate determination. If the parties can't agree upon market rate, then the matter is submitted to arbitration, and the arbitration tribunal determines market rate. Well, are – excuse me. Are you saying that for the two extensions, 2010 to 2015 and 2015 to 2020, that that rate of rent is not in dispute? I don't – I believe that that rate of rent is in dispute. I believe that it's clear under Section 41A of the original lease and under the First Amendment that during that time no base rent shall be payable. And the Second Amendment did nothing to change that. That Second Amendment is concerned on its face with two things. One, amending certain parking provisions under the 1B lease. And two, adding an additional option to extend the term further in time, that is from 2020 through 2034. That 2020 through 2034 time period is not the time period before the Court here. Time period before the Court here is 2020 through – pardon me – is 2010 through 2020. During that period, during those term extensions, no base rent shall be payable under Section 41A under the First Amendment. The Second Amendment does not change that status quo. I believe ARE108 has never disputed during the five years this case has been pending, that at least up until the moment before the Second Amendment was signed, that no base rent was payable during the term extensions. That was the status quo, and the Second Amendment simply did not change that fact. The Second Amendment is not ambiguous on that point either. It doesn't address it at all, quite frankly. That Second Amendment does mention those Section 41A extension rights in multiple places. It doesn't amend them, doesn't abolish them, doesn't suggest that they have been amended or abolished. To the contrary, the Second Amendment requires that those Section 41A amendment rights – pardon me – extension rights, base rent-free extension rights, have been exercised by Monsanto in order for it to have the additional extension rights the subject of the Second Amendment to the Phase 1B lease. Now, with respect to ambiguity, under North Carolina contract law, for a written contract to be ambiguous, its language must be fairly susceptible to multiple reasonable interpretations. I believe what that means here is that for ARE108 to show a facial ambiguity, it must point to language in that Second Amendment to the Phase 1B lease that can reasonably be read to modify or abolish Monsanto's base rent-free extension rights under 41A. ARE108 has not done that because no such language exists. I believe what ARE108 argues is that there is a curiosity in the Second Amendment to the Phase 1B lease regarding the floor for the market rate for the additional extension terms from 2020 through 2034, a time period not before the Court today. Is there any language that suggests that the 103 percent figure applies to the 2010-2015 extensions? I can't find it. No, Your Honor. That 103 percent language only applies to a floor for market rate for 2020 through 2030 and then also, again, to the floor for determining market rate for 2030 through 2034. So how that language is applied, first of all, I think at the threshold it's important to note that how the language is applied has to do with the rent during a time period not before the Court. This is a separate issue, but how that is applied is clear. It's 103 percent of zero, so the floor is zero, and the parties agree upon a market rate. If they can't, it goes to arbitration, and there's a fair market rate during these additional extension terms. Mr. McKean, I believe, mentioned that it would be illogical for it to be zero. I believe that's not the case. In context, Monsanto was not the original tenant under the Phase 1B lease. That was Paradigm Genetics back in 2000 changed its name to Icoria. ARE 104, the predecessor to ARE 108, was the landlord. They agreed back in 2000 for base rent under Phase 1B at a particular number for 10 years and then zero for 10 years. They agreed back in 2000 that that was the case. Now, the parties, after Monsanto was assigned the lease in 2005, decided in 2007 to further extend the term. This was the one lease where Monsanto had never negotiated any base rent, and so there was no good floor to put in for 2020 base rent. And so in 2007, instead of trying to pick a number, the parties said, we'll negotiate that in 2020, 13 years in the future, not now, 13 years in advance. So it does make sense in context. That's briefly why it would make sense for it to be zero. More importantly, that's not the issue before the court here. Mr. McKean mentioned latent ambiguity. Latent ambiguity is not ambiguity light. It is not curiosity. It means that the language is clear, but its application and practice is impracticable. That's not the case here. It's very clear how to determine the floor for market rate and the market rate during the additional extension terms. He mentioned, I believe in his reply brief, that there might be a drafting error. Area 108 has not pleaded any contract formation defect. All of this dispute has to do only – all of Mr. McKean's arguments regarding the 103% have to do with the floor for rent during the additional extension terms, not the issue before the court today. The issue before the court today is base rent during the term extensions 2010 through 2020. And at that point, the lease and the First Amendment are plain and unambiguous. I understand Mr. McKean to be arguing not that the 103% pertains to the lease from 2010 to 2020, but the fact that that curiosity as you describe it with respect to the rent floor post-2020 is sufficiently grave to create an ambiguity with respect to the rent as a whole. It reflects back, in other words, to create ambiguity with respect to that Section 1 in its entirety, I think, is the argument. Perhaps so, Your Honor. I believe, however, that to the extent – first, I don't believe that zero is grave, and there certainly is no allegation of unconscionability here. I think it does make sense. But to the extent that zero were curious or strange, that would be relevant to some theoretical future dispute regarding the rent floor in 2020 through 2034. It is not relevant to the dispute here. The dispute here concerns 2010 through 2020. And there, Section 41A and the First Amendment are as clear as day. The Second Amendment, in fact, had nothing at all to do with the base rent payable 2010 through 2020. And if you had a dispute in 2020, you wouldn't be here. You'd be in front of an arbitrator. Exactly so, Your Honor. For 2020 through 2034, a floor of zero really doesn't change the calculus at all. The parties still agree upon a market rate. There's just no floor. There's also, in that same provision, no floor for determining the amount of rent for parking. There doesn't need to be a floor for the parties to first attempt to agree upon a market rate, and failing that, go to an arbitrator. That issue simply is not illogical, nor does it have any bearing one way or the other regarding the base rent payable during the term extensions 2010 through 2020. If the parties, to the extent that's curious, it's relevant to the issue of 2020 through 2034, not the issue here. To the extent Your Honors have any questions about the base rent provisions, I'm happy to answer them. Otherwise, I may move on to the attorney's fees provision. Your Honor, we believe here that the results should be the same here as it would be in a theoretical situation where the tenant elected not to pay rent under protest. The landlord was forced to sue to attempt to collect the outstanding rent that it alleged that it was owed, and the landlord were successful in its interpretation of the contract were found to be the right one. In that case, I think there would be no dispute that the landlord would be entitled to 15 percent attorney's fees. We think here that the situation should be the same. It is the converse situation. Of course, the language in 44K of the original lease is very plain that it is a reciprocal attorney's fee agreement. It does not matter which party wins. The prevailing party is entitled to attorney's fees. Well, that statute in North Carolina is a one-sided statute. It favors the creditors and not you in this situation because there's no mature debt. There's nothing on the face saying what the debt is. And so how do you get around that? Your Honor, it does favor the creditor, not the debtor. Here, Monsanto is the creditor. Here, Monsanto paid that money under protest before the complaint was filed. Monsanto sued to collect that debt. That money, ARE-108, was on notice. But if it kept that money, it risked having to pay 15 percent attorney's fees. It knew that. Its sophisticated counsel knew that. It did not pay the money back. You're the creditor with respect to the attorney's fees issue. And your evidence of indebtedness is? Is the lease itself, Your Honor. Why not the protest notice? I believe that the lease itself, Your Honor, is the evidence of indebtedness under which the disputed rent was paid under protest. They're called contested 1B rent payments. And to the extent that Monsanto has owed that money back, importantly, it is under Monsanto's interpretation of the lease. So if it's paid back, it's paid back under the lease. Certainly, under leases, and this Court has ruled that it is possible for a tenant to be the creditor. That is possible. When overpayments of rent are made, it can be a creditor. Under this lease in particular, there are two places where when the tenant pays money to the landlord, the landlord holds that money as the debtor. So here, at the time the suit was filed, Monsanto was the creditor. ARD 108 was the debtor. That debt was mature because when you overpaid rent or you paid rent under protest, it is mature the moment that you pay it. Well, in light of Judge Duncan's previous question, how is the lease evidence of indebtedness from your point of view? I think, Your Honor, generally speaking, that leases can be evidence of indebtedness under North Carolina law. And here, it is the evidence of indebtedness because the terms of the contract provide that we do not, Monsanto does not owe that rent. And so when you overpay rent, that is the fundamental bedrock of landlord-tenant law, that you can pay under protest. And to the extent that you're right and you didn't need to pay that rent, you get it back. And so the lease provides that we owed $0 in rent. That is the evidence, that we owed $0. We paid more under the foundational landlord-tenant law. We don't believe that the contract itself needs to say, you are allowed to pay under protest and get that back. That is ingrained in landlord-tenant law. And if I may, I will reserve the balance of my time. But if that were true, if that were the case under the lease, then the debt, the maturity of the debt would relate, why would the maturity of the debt not relate to the judicial determination that, in fact, you did not, you owe no base rent under those terms? Your Honor, I see that my time, I'm over my time, if I may answer briefly. Your Honor, maturity is a question of when the money was owed back, not the time that the court enters its judgment. Otherwise, a debt would never be mature until a court decided that that was the case. You could have what you believe is the most clear contract in the world. We believe this one is very clear. You're not actually entitled to that money, arguably, until the court says that you're entitled to it. Nevertheless, the money was actually mature. The debt was mature at the time we alleged that it was mature, namely the moment we paid it. Just because a court sometime later decides that we are right does not mean that it's the court's judgment that is mature, that makes it mature. If that were the case, then no debt could be mature before filing a lawsuit. Thank you, Your Honor. Thank you, Your Honor. Really briefly relating to the motion of summary judgment, as all three of you referenced regarding the market rate issue, and particularly Judge Duncan mentioned at the end regarding timing. Again, I state to the sentence, as used herein, this is in the second amendment, as used herein, market rate shall mean the then market rate as determined by the landlord and agreed to by the tenant, which shall in no event be less than the base rent payable as of the date immediately preceding the commencement of such additional extensions, which simply means that in order to have a calculation of 103 percent, there had to be a number that was relevant the day before the additional extension occurred. And some of the negotiations are consistent with the fact that it was current rent. With respect to the attorney's fees issue, fundamentally there is a cascade or waterfall of arguments against Monsanto's position. And these relate to the key sections in play, because North Carolina law is clear that there must be statutory authority for any attorney fee recovery. In particular, referring to section 621.1, section 621.2, in particular subsection 5, relates to a notice requirement, which is required, and also the fact that the legislature in North Carolina enacted in 2011 a new statute, section 626.6, which permits a reciprocal attorney's fees clause. And that shows that if you had a contract now, you might have a different situation. But this contract was entered into in the year 2000, so we rely on the previous statutes. And in those statutes, as I say, there is a waterfall of arguments. They have to show that Monsanto was owed any contractual debt, and under the lease they were not. That is a requirement that they must show that it was mature debt. Under the lease, there was no mature debt. Can we just walk through it? So a party owed a debt. The argument is that a tenant who is paying rent that is unauthorized, that has no basis in law, is owed the return of that, the money's paid. So you have a party owed a debt. Evidence of indebtedness. There is evidence of indebtedness. It seems to me, arguably, Monsanto's arguing in the lease, but certainly in the protest notice. Monsanto is putting you on notice in a writing that they do not believe they owe you base rent under the terms of the contract. So that puts you on notice that they are seeking, that they are dealing with ARE as they, Monsanto, the creditor, and you, ARE, the debtor. So you have the debt. You have a party owed a debt. They're owed the return of the lease money they should not have paid. And there's an evidence of indebtedness. And the maturity, well, that's a little, that is a little difficult. But they say they owed it, that the debt matured when they paid it because they shouldn't have paid it. Therefore, it became due when paid. So if you could respond, at least that's how I understand the argument. So if you could respond sort of more specifically to that, I would find that helpful. Sure. A couple things were in play there, Your Honor. One is that Monsanto didn't initiate or file this suit back in 2010 as a creditor to enforce a debt contractually owed to it. Can we stay with my questions? My question said, or at least how I'm framing the argument in my mind. As far as Monsanto is concerned, when you took their, took the lease money that you did not have a right to take and they put you on notice of the fact that they thought you didn't have a right to take it, why did they not become a creditor with respect to the lease money that they should not have had to pay at that time under the terms of the protest? Okay. Under the, as you were put on notice. Yes, Your Honor. We're referring to the November 17, 2010 letter. That's what you're referring to. And in that letter, there is no, as stated by this Court, there is no separate attorney's fees clause. ARE never signed any acknowledgment of this letter. And also, any sort of, you know, separate contract or notice must satisfy expressly Section 6-21.25, which sets forth the notice requirements, including a five-day period for payment of the outstanding balance before attorney's fees are ever owed, and also must set forward the, also reference to the statute. In no place, in nowhere, have they ever satisfied that notice, which is a requirement in this case. Right. What I was trying to do was get to the first point. The district court said that there were no attorney's fees, no attorney's fees could be owed before getting to that. So what I was trying to do was proceed somewhat in order and find out and discuss with you whether or not the threshold question of whether attorney's fees could be awarded is whether the district court was correct with respect to that at the threshold level. At the threshold level, the attorney's fees could not be recovered by the parties under these unique facts, under these statutes with respect to the lease. And I would even argue the ARE couldn't recover attorney's fees in this case because they had also no debt owed under the lease because they were receiving rent payments in protest. But then the district court on the threshold issue said that, okay, well, there was this separate notice in November of 2010, but that notice doesn't create any separate attorney's fees arrangement. Attorney's fees are only mentioned there as, if I can conclude, Your Honor, as referring back to the lease or reserving rights under the lease. And in no way, shape, or form did that notice satisfy the requirements of the five-day notice period. I do understand that. But it does, the protest notice does cover attorney's fees. It does reference attorney's fees. It's not what, Monsanto's not waiving and reserves all rights to recover interest, which the court, district court actually awarded prejudgment interest, interestingly enough, from the moment the payments were made. Right? That's right. And that's a different issue. But it does seem somewhat consistent with my point about maturity. But just bear with me for a moment. The protest notice does discuss attorney's fees. You're quite right that there's not been any finding that the appropriate statutory notice was given. But you were saying, I thought your argument was that the protest notice couldn't be evidence of indebtedness, and that was what my question was going to. Right. Because the protest notice only refers to, you know, something arising from the lease, and there's not a debt owed under applicable law, statutory law, by ARE to Monsanto under the lease. And just the reservation of rights, you know, is not adding a new attorney's fees clause under this notice. There's not a separate agreement regarding attorney's fees. Now, again, if this whole thing was a later contract after 2011, it may have a different argument. But this is a contract that entered into 11 years before that. So the fact of the matter is, if there's any ambiguity here, as district court said, it should be construed against Monsanto, and also they didn't satisfy all the other requirements under the statute relating to outstanding debt, mature debt, regarding this notice. Thank you, Mr. McKean. Thank you, Your Honor. Mr. Watkins. Thank you, Your Honor. With respect to the attorney's fees issue, first I'll mention as an aside, Mr. McKean mentioned, I believe, on a few occasions the new business contracts attorney's fees statute under North Carolina law. But there's nothing about that that makes business contracts, on the one hand, and evidences of indebtedness mutually exclusive. So you can be entitled today to attorney's fees under both. So just because it would also be a business contract doesn't mean that it wouldn't be a note. In fact, the new statute makes explicit in 6-21.6E, subsection E, it says that nothing in this section shall in any way make valid or invalid attorney's fees provisions in any note, conditional sale contract, or other evidence of indebtedness. So I think that that argument is a non-starter. What bothers me, and maybe you can help me out,  there is an agreement signed by both parties that I will pay if I lose, etc. In this case, there wasn't an agreement signed by ARE to pay attorney's fees in the event of some dispute. So you just unilaterally say that you're going to owe us attorney's fees if we win. And help me out with that. How do you get around the fact there's no agreement to pay attorney's fees, no mutual agreement to pay attorney's fees? Well, Your Honor, I believe section 44K of the original lease is that mutual agreement to pay attorney's fees to the prevailing party. I think that it's explicit there, signed by both parties in 44K of the original lease. And that's why, and it is that provision that causes you to hang your hat on the lease agreement rather than the notice, the protest notice? Your Honor, I think that both could potentially be perfectly fine evidences of indebtedness here. I think the lease agreement, I think... With respect to attorney's fees? With respect to attorney's fees, yes, Your Honor. I do believe that that notice on November 17th does invoke the original lease agreement. But ARE didn't sign it. That's exactly right. Correct, Your Honor. So you would have to argue that by accepting the rental payment, do you have any authority for the proposition that accepting the rental payment under protest constitutes such agreement with respect to attorney's fees? Because that would be what you would have to argue, I imagine. I think that would be what we would have to argue. I do not believe that we have any authority on that narrow point, that that would be on something so particular. However, I believe generally the law of contracts and potentially objective manifestations of assent, I believe that that could be construed to be a unilateral contract under just federal contract law principles, not on something this narrow, certainly, Your Honor. But North Carolina attorney's fees are controlled statutorily as opposed to general contract law. Yes, Your Honor, that's exactly right. And so that's why we believe that while 44K provides this mutual, reciprocal, explicit attorney's fees agreement, it needs to be statutorily authorized. And we believe it is statutorily authorized. But then you have to come to terms with the fact that North Carolina disfavors attorney's fees payments generally. So we would be interpreting expansively in the context of a statute that is not expansive in scope. Your Honor, on this point, the North Carolina Supreme Court is clear. This attorney's fees statute, this carve-out regarding attorney's fees on evidence of indebtedness is to be construed liberally. One time after another, the North Carolina Supreme Court and courts have said so. You are absolutely right, Your Honor. Generally, in the big picture, back in 2011, North Carolina disfavored. But in this carve-out, they've asked this carve-out explicitly to be interpreted liberally. We believe we fall squarely within this carve-out. Your Honor mentioned maturity and how that might be an issue. And I think Your Honor made exactly the right point here. Not only did the district court award prejudgment interest from the moment of that very first payment that predated the complaint, ARD 108 agreed to that. We agreed to that with them. Prejudgment interest is only due from the time that the money was owed back, only due from the time it was mature. If it had not been mature, we would not be entitled to prejudgment interest. ARD 108 agreed with us that that was the time to start the clock. There's no dispute on that. District court ruled it. So maturity, we believe, is a clear question. Your Honor, I see my time is up. Thank you very much. Thank you. Thank you. We will come down and greet counsel and proceed directly to the next case.
judges: Allyson K. Duncan, Henry F. Floyd, Clyde H. Hamilton